(C. D. 762)

MICHELSON & STERNBERG, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 28, 1943)

*Puckhafer, Rode & Rode* (*Howard C. Carter* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is a suit against the United States in which the plaintiff seeks to recover a portion of the duty assessed on merchandise described on the back of the consular invoice as "Calabash gourds." The description on the face of the invoice relates merely to the quality of the goods. The appraiser described the merchandise on the invoice as "Calabash gourds, dried, with pith removed and one or both ends sawed, as parts of the S. A. n. s. p. f." and duty was assessed at the rate of 60 per centum ad valorem under paragraph 1552 of the Tariff Act of 1930 under the provision for smokers' articles and parts thereof. The plaintiff claims that the articles are dutiable at 10 or 20 per centum ad valorem under paragraph 1558 as non-enumerated unmanufactured or manufactured articles.

Mr. Aaron Michelson, a partner in the importing firm, was called as a witness in behalf of the plaintiff. He testified that he had been importing like articles for 5 or 6 years but had been familiar with them for 20 years; that the gourd is grown in the fields in the Union of South Africa; that between 5 and 10 per centum of the gourds in this shipment had both ends sawed off, the remainder having but one end sawed; that the imported merchandise is sold to smoking pipe manufacturers who manufacture calabash pipes from the articles; that in the manufacture of pipes the imported articles are first tumbled and buffed, after which the top and the bottom are sawed off and the inside is sandpapered to make it smooth; that the rims in the inside are turned on a machine and a rim is made on the inside to permit the insertion of a cork lining which is fastened therein by glue; that a hole is drilled in the neck of the gourd and a plastic connection inserted upon which a hard rubber stem is mounted; that the stem is then heated in hot water to permit bending so as to shape it for the pipe; that a meerschaum blank is shaped to fit the top of the gourd and is inserted to form the bowl of the pipe, after which all parts are polished; that the process is completed in from 1½ to 2 hours.

A sample of the merchandise having one end sawed off, which the witness testified was in its imported condition, was admitted in evidence and marked exhibit 1 and a complete shell of a gourd with the contents removed through holes bored therein was admitted in evidence as illustrative exhibit A. Also, a completed pipe manufactured from a gourd shell was admitted in evidence as illustrative exhibit B.

The witness testified further that similar gourds are sometimes used in making flower vases and a sample of such a flower vase was admitted in evidence and marked illustrative exhibit C. The shape of this exhibit is identical with exhibit 1, with the exception that a base has been attached which holds the shell in an upright position.

On cross-examination, the witness testified that illustrative exhibit C represents a minor use of the gourds; that he imported the instant shipment to sell to pipe manufacturers, and exhibit 1, as far as he is concerned, is dedicated to the use of making pipes; that it is an unfinished body of a calabash pipe.

The parties entered into the following stipulation with relation to the derivation and treatment of the imported article before sh pment.

1. The gourd was cut from the vine.
2. The top of all the gourds was sawn off 4 or 5 inches from the stem, and the stem of some of the gourds was also sawn.
3. The seeds, pulp and pith were scraped out.
4. The plaintiff's exhibit 1 was dried in the sun.

Paragraph 1552, under which duty was assessed, reads as follows, the portion in italics being the portion under which duty was assessed:

PAR. 1552. Pipes and smokers' articles: Common tobacco pipes and pipe bowls made wholly of clay, valued at not more than 40 cents per gross, 15 cents per gross; valued at more than 40 cents per gross, 45 per centum ad valorem; tobacco pipe bowls, wholly or in chief value of brier or other wood or root, in whatever condition of manufacture, whether bored or unbored, and tobacco pipes having such bowls, 5 cents each and 60 per centum ad valorem; pipes, pipe bowls, cigar and cigarette holders, not specially provided for, and mouthpieces for pipes, or for cigar and cigarette holders, all the foregoing of whatever material composed, and in whatever condition of manufacture, whether wholly or partly finished, or whether bored or unbored, 5 cents each and 60 per centum ad valorem; pouches for chewing or smoking tobacco, cases suitable for pipes, cigar and cigarette holders, finished or partly finished; cigarette books, cigarette-book covers, cigarette paper in all forms, except cork paper; and *all smokers' articles whatsoever, and parts thereof, finished or unfinished, not specially provided for, of whatever material composed, except china, porcelain, parian, bisque, earthenware, or stoneware, 60 per centum ad valorem;* * * * . [Italics ours.]

The plaintiff cites *Briarwood Corp.* v. *United States*, 1 Cust. Ct. 458, Abstract 39702, wherein articles which appear from the description in the decision to be identical with the articles in this case which were sawed at both ends were held dutiable as nonenumerated unmanufactured articles under paragraph 1558 of the Tariff Act of 1930. The issue in that case was not the same as that in the case herein involved, however, because the merchandise in that case was classified by the collector as nonenumerated manufactured articles under paragraph 1558 and the only question involved was whether they were manufactured or unmanufactured. The court held that the merchandise was raw or unmanufactured.

The question involved in this case is whether these raw or unmanufactured articles, which were shaped in the form of a body of a pipe by nature, are a part of smokers' articles because they are chiefly used for making pipes, only one other use having been shown, and that a minor one.

In T. D. 49733 (1), there is published an abstract of a letter from the Commissioner of Customs to collector of customs at New York holding that calabash shells, consisting of necks of gourds sawed at each end, were dutiable as unfinished parts of smokers' articles under paragraph 1552, and, in T. D. 49840 (1), there appears to be another letter to the same effect, but it covers gourds sawed on either one or both ends and directs that the decision in Abstract 39702 be disregarded. This latter letter seems to be the authority under which the collector acted in this case because T. D. 49840 (1) is noted in red ink on the invoice.

Counsel for the plaintiff argues in his brief that the wording of paragraph 1552, in which detailed provisions are made for pipes, pipe bowls, mouthpieces, etc., in the first part of the paragraph,

indicates that the latter portion, covering "all smokers' articles whatsoever, and parts thereof, finished or unfinished," was not intended as a catch-all provision which would include pipes and parts thereof not described in the first part of the paragraph. We are not impressed with that argument. The same point was raised in the case of *Bush & Co.* v. *United States*, 10 Ct. Cust. Appls. 161, T. D. 38402, and the court held that pipe stems, which were not specifically provided for in the first part of paragraph 381 of the Tariff Act of 1913, covering only pipes and pipe bowls, were dutiable under the provision for smokers' articles in the latter part of the paragraph. The court said at page 164:

* * *. The court is, therefore, of the opinion that the Congress did not intend to restrict the provisions of this paragraph relating to pipes and bowls thereof as exclusive of the language therein applicable to such articles, but intended also the language therein relating to "smokers' articles" equally applicable to pipes and bowls, in all cases wherein the natural scope of said terms was so inclusive and the particular article was not more specifically provided for in the paragraph as a pipe or pipe bowl.

The plaintiff claims also that exhibit 1 is only a material which is chiefly used for making pipes and is not, in its imported condition, a part of a pipe, finished or unfinished; that it is an unmanufactured article and cannot be considered as an unfinished part of a pipe because the only work done on it before exportation was to cut off 4 or 5 inches of the stem of the gourd and remove the seeds and pith, which was done merely to get the product by itself and in condition for exportation to the United States. The plaintiff cites *United States* v. *National Importing Co. (Inc.) et al.*, 12 Ct. Cust. Appls. 186, T. D. 40169, wherein amberoid, in form resembling pipe bits and cigarette holders but not bored or shaped for such purpose, shown to be manufactured after importation into smokers' articles and also into jewelry, pendants, and drops, was held dutiable as amberoid, unmanufactured, rather than as smokers' articles. The court said at page 188:

The authorities seem to be unanimous in their support of the proposition that in order to take the importation out of paragraph 11 as amberoid, unmanufactured, it must be found that they were manufactured to such extent that they were committed or dedicated to a use as smokers' articles alone, and that if they had not been so manufactured when imported, and were in such form that they could readily be used for other purposes and were so used, they should be classified as amberoid, unmanufactured. *United States* v. *Lyon & Healy* (4 Ct. Cust. Appls. 438; T. D. 33873), *Wyman* v. *United States* (T. D. 28924), *Athenia Steel & Wire Co.* v. *United States* (1 Ct. Cust. Appls. 494; T. D. 31528), *Worthington* v. *Robbins* (139 U. S. 337).

The case of *United States* v. *Lyon & Healy*, cited in the court's decision, is reviewed by the court as follows:

The reliance of the Government on the case of *United States* v. *Lyon & Healy, supra*, is without justification. Violin and cello necks were held to be parts of musical instruments because they were so far shaped as to indicate *per se* their

ultimate use, and as imported were unfit for any other use. Round pieces of wood and ivory, intended to be made into mouthpieces for flutes, etc., were held not to be parts of musical instruments insofar as their ultimate use could not be definitely determined. We think the court's opinion in this case supports the opposite contention to that insisted upon by the Government in this case.

Counsel for the defendant attempts to distinguish the merchandise and principle in *United States* v. *National Importing Co. (Inc.), et al., supra,* using the following language in his brief:

There, the merchandise was not found to have been sufficiently bored nor shaped as to be usable as pipe bits or cigarette holders, but on the contrary, were in such form as to be readily adaptable to other purposes as well. The court simply found in view of the amorphous character of the merchandise that the provision for amberoid unmanufactured was more specific than the provision for smokers' articles.

While it is true that there is no provision for "gourds, unmanufactured," in the tariff act herein involved, as there was for "amberoid, unmanufactured" in the case cited, the principle is the same. It does not appear from a review of the case cited that the court held that the merchandise was dutiable as "amberoid, unmanufactured," because it was more specifically provided for under that provision than under the provision for smokers' articles. Such a ruling would be contrary to all precedents because it has been held that the provision for "all smokers' articles whatsoever" is a comprehensive provision embracing "everything used chiefly by smokers, in that pursuit, and for that purpose." *United States* v. *Dunhill,* 13 Ct. Cust. Appls. 310, T. D. 41231, and cases therein cited. The court evidently reached the conclusion that the articles were not smokers' articles because they had not been so far manufactured as to be dedicated to that use only. Parts of gourds like those in exhibit 1 in this case were held to be unmanufactured articles in the case of *Briarwood Corp.* v. *United States, supra.* By what principle could it now be "found that they were manufactured to such extent that they were committed or dedicated to a use as smokers' articles alone," as stated in *United States* v. *National Importing Co. (Inc.) et al., supra?* They were formed by nature in the rough shape of a pipe body, but that was not a manufacturing process. A comparison of exhibit 1 with the finished pipe in illustrative exhibit B demonstrates that a considerable portion of the imported gourd neck is required to be removed before it is made into a pipe. The witness testified that, in making a pipe from the imported article, "the top of the gourd is then sawed even, and the bottom of the gourd is sawed in the same manner." That does not indicate that it was subjected to merely an "evening process," as stated by counsel for the defendant in his brief.

Counsel for the defendant urges, in his brief, that *Monroe Foreign Forwarding Co.* v. *United States,* 55 Treas. Dec. 674, T. D. 43354, is an authority which is controlling in the ultimate decision in the in-

stant case.  The merchandise in that case was invoiced as "washed bamboo pipestems."  The court reviewed the evidence as follows:

At the trial it was testified that the only thing done with the merchandise when imported was that it was cut in certain lengths and that this was done in order to save freight.  The testimony also shows that the merchandise is used as pipestems but not in the condition imported.  Before being used as pipestems the pieces of bamboo are subjected to four different processes: First they are tumbled in order to give them a smooth and sleek appearance; second they are frased, a whittling process by means of which one end of the stem is made uniform in diameter in order to fit the hole in the body of the corncob; third they are topped, a process by which the rough edges are removed from the end of the stem which is held in the mouth; and the fourth process is what is known as needling.  The testimony shows that there were holes through the stems but they were claimed to be full of pith or fuzz, and in order to make clean holes needles were run through.

Upon cross-examination the witness testified that he did not know what processes the raw bamboo stems had gone through, nor could he determine whether they had been washed or subjected to other process from an examination of them. Processes applied to the stems, such as cutting in lengths and washing, advancing them in condition, are, according to *Cone & Co.* v. *United States* (14 Ct. Cust. Appls. 133, T. D. 41672), manufacturing processes.  The invoice states that the stems are washed, and it is also shown by the invoice that the various lengths have different values, thus implying that the stems had been sorted before shipment.  There is no proof in the record to show an unmanufactured condition of the stems when imported.

The court found that the merchandise was partly manufactured before shipment and held that it was dutiable under the following. provision in paragraph 1454 of the Tariff Act of 1922.

PAR. 1454.  Pipes and smokers' articles: * * * pipes, cigar and cigarette holders, not specially provided for, and mouthpieces for pipes, cigar and cigarette holders, all the foregoing of whatever material composed, and in whatever condition of manufacture, whether wholly or partly finished, or whether bored or unbored * * * 60 per centum ad valorem; * * *.

That paragraph contained also a provision for "all smokers' articles whatsoever, and parts thereof, finished or unfinished" which is the same as the provision under which the instant merchandise was classified by the collector, but that provision was not considered or discussed by the court in its decision.  Therefore the issue in the two cases is not identical.  The pipestems were considered as specifically provided for in that case, evidently under the provision for "mouthpieces for pipes" and it is evident that they had been so far advanced as to be dedicated to that use only.  As stated previously, articles like those herein involved have been held not to be manufactured (*Briarwood Corp.* v. *United States, supra*), but are raw or unmanufactured materials, which is not the condition of the merchandise in the case cited.

The question in the instant case is whether or not the imported articles are finished or unfinished parts of smokers' articles.  It is manifest that they are not finished parts and the only question involved is whether they are unfinished parts.

The only decision to which our attention has been directed wherein the issue involved was whether or not a crude substance constitutes a part of an article to be manufactured in the United States is *California Institute of Technology* v. *United States*, 65 Treas. Dec. 934, T. D. 47092. In that case, calcite crystals were classified by the collector as parts of spectrographs under paragraph 228 (a) of the Tariff Act of 1930, the provision reading, "Spectrographs * * * and parts of any of the foregoing, finished or unfinished, 60 per centum ad valorem." The calcite crystals were in the condition in which they had been found in the earth, the only thing having been done to the product after it was mined and before shipment being to cleave the crystal into two parts. The crystals were used on spectrographs in that condition without further processing. The court held that they were not parts of spectrographs, finished or unfinished, but were free of duty under the provision for crude minerals in paragraph 1719. That case raises an issue exactly parallel with the one herein involved. The court said:

> As to paragraph 228, under which the collector assessed duty: This covers *eo nomine*, among other things, spectrographs, spectrometers, *and parts thereof.* Under the facts in this case we cannot conceive of this merchandise being a part of a spectrograph or spectrometer, merely because these crystals in their natural condition, after a mere splitting, were used in such instrument for X-ray work. It would require a considerable stretch of the imagination to say that merely splitting a natural crystal into two portions renders it part of a spectrograph or spectrometer. It is our judgment that this merchandise was improperly classified by the collector, and that it is not dutiable under paragraph 228. [Italics quoted.]

In *Bartley Bros. & Hall* v. *United States*, 20 Treas. Dec. 857, Abstract 25455, webbing in the piece which, after importation, was cut to the length required for straining over the tree of a saddle, and so used, was held not to be within the provision for "saddles, saddlery, in sets or parts, finished or unfinished" in paragraph 461 of the Tariff Act of 1909. The court said:

> In former decisions of the board the term "saddlery" has been held to include articles "used in the equipment of horses." G. A. 5320 (T. D. 24353); G. A. 5321 (T. D. 24354). These cases arose under the act of 1897, but there has been no material change in the corresponding provisions of the act of 1909. The evidence introduced in this case is not sufficient to establish that the term has a well-defined commercial meaning that would include the webbing now under consideration, which, in our opinion, is material used in making saddles, rather than saddlery. It is in fact flax webbing and is specifically provided for in paragraph 349.

In *United States* v. *Borrelli & Vitelli*, 19 C. C. P. A. (Customs) 291, T. D. 45467, the question involved was whether certain articles were unfinished jewelry or materials of metal suitable for use in making jewelry. The court held that certain silver pendants which were completed to the extent that it was necessary only to provide some kind of a fastener for the purpose of attaching them to necklaces or

to the ear, for earrings, were unfinished jewelry while filigree balls with silver wire running through each ball, each end of the wire being formed into a loop, so that the balls could be connected together without additional manufacture, used in making earrings, necklaces, and pendants, and in making all kinds of combinations with beads, were held not to be unfinished jewelry as they had not been advanced in manufacture beyond the material stage. A witness for the importer, on cross-examination, testified that he called both classes of articles unfinished jewelry, but the court placed little importance on that statement in reaching its decision. The court said:

We attach but little if any importance to the statement of the witness that the merchandise is unfinished jewelry, but the testimony shows the nature, construction, and use of the articles, which is important.

The same principle may well be adopted in the instant case, inasmuch as the witness testified on cross-examination as follows:

X Q. * * *. Exhibit 1 is the unfinished body of the calabash pipe, is it not?—A. Yes, sir.

The question calls for a conclusion of the witness, a judgment which the court is required to determine from the evidence. We prefer to give little weight to this question and answer and decide the case on the facts of record, as the appellate court did in *United States* v. *Borrelli & Vitelli, supra.*

In *United States* v. *Cartier, Inc.*, 20 C. C. P. A. (Customs) 215, T. D. 45994, the stipulated facts showed that the articles under consideration consisted of 43 platinum, enamel, and diamond beads and one clasp, all in chief value of diamonds, and that the beads "have no other use than for stringing as part of a necklace" and the clasp "no other use than as a clasp for a necklace." The court held that the articles were not jewelry, finished or unfinished, but were materials dedicated to the use of making a necklace, and, as such, were dutiable at 40 per centum ad valorem as "articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances" under paragraph 214 of the Tariff Act of 1922.

According to the stipulated facts in this case, the merchandise consists of the stems of gourds sawed off 4 or 5 inches from the stem, and some of the stems were also sawed off at the other end; that the seeds, pulp, and pith of the gourds were scraped out and the stems were dried in the sun. Does this process make an unfinished part of a pipe? We are of opinion that it does not. It is no more a part of a pipe than a corncob, with the corn removed, which could be made into a corncob bowl of a pipe by subsequent processes. The imported products were not made into an unfinished part of a pipe by any manufacturing process but are in their natural or crude condition the same as the calcite crystals which were held not to be finished or

unfinished parts of spectrographs in the case of *California Institute of Technology* v. *United States, supra.* The imported articles have not been manufactured, as were the unfinished pipestems in *Monroe Foreign Forwarding Co.* v. *United States, supra.* We find that they are materials chiefly used in the manufacture of pipe bodies but not, in their imported condition, dedicated to that use only.

In harmony with our decision in *Briarwood Corp.* v. *United States, supra,* we hold that the articles are dutiable at 10 per centum ad valorem as nonenumerated unmanufactured articles under paragraph 1558 and that claim in the protest is sustained. Judgment will·be entered in favor of the plaintiff.